Fremont Cake & Meal Company v. Commissioner.
Fremont Cake & Meal Co. v. Commissioner
Docket No. 25119.
United States Tax Court
1950 Tax Ct. Memo LEXIS 38; 9 T.C.M. (CCH) 1047; T.C.M. (RIA) 50284; November 20, 1950
*38 J. Lee Rankin, Esq., and Philip G. Johnson, C.P.A., 1224 Sharp Bldg., Lincoln, Nebr., for the petitioner. William B. Springer, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: Respondent has determined deficiencies in income and excess profits tax for the fiscal year ended April 30, 1946, of $5,567.18 and $6,228.88, respectively. The issue for determination is whether the sum of $14,859.16 resulting from a shortage in inventory is deductible as an inventory loss, a bad debt, or as cost of goods sold. Part of the facts are stipulated and are so found. Findings of Fact Petitioner is a corporation organized August 13, 1945, under the laws of the State of Nebraska with its principal place of business located at Fremont, Nebraska. Petitioner upon organization issued 1,003 shares of common stock of $1 par value, for a payment of par in cash, to the following stockholders: Gooch Milling & Elevator Company
of Lincoln, Nebraska
600 shares
Pete Marr of Fremont, Nebraska
400 shares
John Vanier of Salina, Kansas
1 share
Harry B. Lilly of Lincoln, Nebraska
1 share
Harry Wiysel of Fremont, Nebraska
1 share
*39 No other stock was issued. Petitioner filed its income and declared value excess-profits tax and excess profits tax returns for the fiscal year ended April 30, 1946, with the collector of internal revenue for the district of Nebraska. The organization meeting of petitioner was held September 1, 1945, with the above named individual stockholders present. J. J. Vanier, Harry E. Wiysel and H. B. Lilly were elected directors. The board of directors of petitioner was authorized by proper motion of the stockholders to purchase properties offered to petitioner by Peter Marr, doing business as Marr Industries, consisting of Fremont Elevator, soybean mill, Mercer Elevator, machinery and equipment, and automobiles and trucks at a price of $97,376. At a board of directors' meeting later the same day, the following were elected officers: J. J. Vanier, president; H. B. Lilly, vice president; Harry E. Wiysel, secretary-treasurer. The board of directors, after consideration, approved the purchase of land, building, and equipment previously authorized by the stockholders. Also adopted was the following resolution pertaining to the purchase of soybean inventories: "WHEREAS, the purchase of *40 property of Pete Marr has been consummated, the officers are authorized to issue checks for the inventory of July 31, 1945, as per schedule attached, in the amount of $240,110.00. However, due to the fact that 31 days have elapsed since inventory was taken, operation of the properties for the account of Fremont Cake and Meal Company necessitates an adjustment in the payment to Pete Marr to adjust for the operations during the month ended August 31, 1945. All receipts and disbursements having been for the account of the Fremont Cake and Meal Company, the officers are authorized to make the proper calculations and adjustments." The schedule referred to in the resolution showed among other items the following with respect to soybeans: Fremont Elevator
Soy beans (see note)
$198,792.11
Mercer Elevator: Soy beans
3,767.64 The note at the bottom of the schedule reads as follows: "Soy bean inventory subject to adjustment upon final determination of quantities." The schedule was signed for petitioner by Harry E. Wiysel and was signed by Peter Marr. Negotiations and purchase agreements with Marr were oral. It was understood that Marr was not to be liable for shortages *41 after August 1, 1945. On July 20, 1945, an estimated inventory of the soybeans of Marr Industries was made by inspectors of the Federal Warehouse Authority in a manner accepted in the trade and also by the Commodity Credit Corporation for the purpose of verifying collateral for loans. In making the inventory, consideration was given to volume as well as weight computed from samples. This inventory was accepted to be correct within a 3 per cent tolerance. The book inventory of Marr Industries was not found to be at variance with this inventory and required no adjustment. A physical inventory of the soybeans purchased from Marr Industries as well as beans purchased from other sources during August and September, 1945, was made by petitioner as the beans were taken from the warehouse, weighed and processed. This operation was completed October 1 or 2, 1945. At this time a shortage of 8,750.10 bushels valued at $19,337.50 was discovered. Petitioner's journal shows the following entry under date of October 6, 1945: Oct. 6
Debits
Credits
Marr Industries
$19,337.50
Purchases - beans
$19,337.50
To charge back shortage from original inventory purchased
after weigh up
Inventory purchased
$99,659.40
Purchased August
9,099.00
Purchased September
6,015.00
$114,773.40
Inventory received at Mill
41.00
Weighed to Mill Aug.
54,409.00
Weighed to Mill Sept.
46,544.00
Weighed to Mill Oct.
4,914.00
In Elevator 10/6/45
115.30
106,023.30
Short
$ 8,750.10
at 2.21
*42 The soybeans were valued at $2.21 per bushel. This figure was based on the Federal Government support price to the farmer of $2.04 plus additions for grades of beans, elevator handling, brokerage, etc. That a shortage existed was verified upon audit by Elmer Selden, a public accountant. The conclusion was reached that it would be impossible to determine what part of the shortage occurred prior to August 1, 1945. Peter Marr sold 250 of his 400 shares of stock of petitioner to J. J. Vanier at $1 per share. These shares of stock were paid for by Gooch Milling & Elevator Company and recorded on the stock book of petitioner under date of November 24, 1945, as a transfer to Gooch Milling & Elevator Company. This transaction was separate and distinct from any agreement concerning settlement of the soybean shortage. Peter Marr did not consider himself responsible for the shortage in the soybean inventory. Directors of petitioner concluded that they could not prove the shortage arose prior to August 1, 1945, and could not press their claim successfully by litigation. A few days prior to the above stock transaction, Peter Marr agreed to cancel the indebtedness owed him by petitioner *43 in the amount of $4,478.34. This amounted to less than 3 per cent of the shortage. Petitioner's journal shows the following entry under date of November 30, 1945: Debits
Credits
Purchases - soy beans
$14,148.84
P and L
710.32
Marr Industries
$14,821.27
Pete Marr (Per Led. a/c)
37.89
By agreement to adjust a/c
Petitioner's ledger sheet under the title "Purchases - Fremont Elevator" shows a debit entry under date of November 30, 1945, as follows: Adj. old crop Marr Ind.
J-8
$14,148.84
Opinion The first question for determination is whether or not the inventory shortage amounting to $14,859.16 is allowable in computing costs of goods sold. We think it is. The purpose of using inventories in tax computations is to determine in certain classes of businesses, as an intermediate step, the cost of goods sold and ultimately net income. [1] Here, petitioner paid $202,559.75 for soybeans, whatever quantity was obtained. Proper book entries recording this purchase were made. Upon a physical inventory being made at the time of processing, a shortage in the quantity of beans on hand as shown by the book inventory was discovered. *44 This had the result of increasing the cost of the beans processed in the amount of the shortage - 8,750 bushels at $2.21, or $19,337.50. We do not think it material, at this point, how the shortage arose - the cost of the beans processed was increased, regardless. Petitioner, in his tax return, treated the shortage as such and did not claim it as a deduction resulting from a "loss." The agreement to purchase the beans from Peter Marr included the further agreement: "Soybean inventory subject to adjustment upon final determination of quantities." In reliance upon this agreement at the time the shortage was disclosed, petitioner notified Peter Marr who refused adjustment in that amount. Petitioner made a book entry debiting "Marr Industries" in the amount of the shortage and crediting "Purchases - beans." That an action on the contract may have existed we do not now stop to consider other than *45 to say that under these facts a book entry would not establish liability. Nor can we regard the book entry as evidence that petitioner was free from fault. The evidence presented by petitioner, we believe, is sufficient to uphold its position in treating the shortage as an increase in cost of goods sold. The transaction was carried on in a normal business manner relying upon book inventories verified by an estimated inventory made 10 days prior to sale, which was accepted in the trade and by an agency of the Government to be accurate within a 3 per cent tolerance. A more accurate inventory would no doubt have been obtained by physical measurement, but we do not think that practical at the time of sale. The shortage was discovered two months later upon the processing being completed. During this time other purchases were added to the quantity purchased from Marr. The shortage was verified upon audit by a public accountant who also established that petitioner could not prove what part of the shortage occurred prior to August 1, 1945. A payment in recognition of the 3 per cent tolerance allowed by the estimate was received. Under the circumstances and facts in this case we believe petitioner *46 has presented sufficient evidence showing the cost of goods processed to have been increased in the amount of the shortage. Respondent asserts that the cancellation of the amount ($4,478.34) owed Peter Marr by petitioner and the sale of stock by Peter Marr constitute satisfaction of the petitioner's claim. To this we can not agree. The legal principle that, without more, a partial payment of a disputed claim constitutes no admission of liability is well established and needs no citation. It appears to be a payment by Marr within the 3 per cent tolerance allowed in the estimated inventory made by representatives of the Federal Warehouse Authority. From the testimony of Peter Marr and directors of petitioner who participated in the discussion of the shortage we can find no admission of responsibility by Marr nor an agreement of cancellation of the claim in full because of the partial payment. It was not until after petitioner realized it had no provable claim against Marr for the shortage that the claim was abandoned. Respondent regards Peter Marr's sale of stock in petitioner at only $1 per share as additional consideration for cancellation of the claim. There is no evidence before *47 us to warrant this conclusion. Petitioner had been incorporated for only a matter of about 84 days at the time of the sale and during that time was carrying on its books a $19,337.50 shortage in inventory. Without other evidence of value we think the price paid to be reasonable. That additional shares of stock were sold in 1948 at a price of $100 per share based on value computed from the balance sheet and earnings at that time is, we believe, immaterial in the consideration of the price paid for the stock sold in 1945. Further supporting a conclusion that the stock sale is a separate transaction from the inventory shortage claim are the facts of the stock sale. Recognizing corporate entities as we do in this case the stock was not sold to petitioner - it was sold to the major stockholder, Gooch Milling & Elevator Company, and paid for by check. The only part petitioner played in this transaction was recording the transfer in its stock book. Petitioner could have acquired no advantage from the transaction and by no circuitous reasoning can we find legal consideration flowing to petitioner on which to base satisfaction of a disputed claim from this transaction. A further assertion *48 made by respondent is that Marr is indebted to petitioner in the amount of $19,337.50 and that if any deduction is allowable it must be allowable as a bad debt, but that it is not allowable as a bad debt because it is not worthless. We fail to see, however, wherein a debt exists. A "debt," as defined by Webster's New International Dictionary and quoted by the court in , is: "* * * that which is due from one person to another, whether money, goods or services; that which one person is bound to pay to another, or perform for his benefit." The court went on to say, "The term 'indebtedness' as used in the Revenue Act implies an unconditional obligation to pay." Lacking proof to show that the shortage arose at the hands of Peter Marr, no legal obligation could have been established by litigation. It is unreasonable, under these circumstances, to say that petitioner, in failing to pursue his claim to the point of litigation, has failed to establish that there is no obligation to pay. There being no legal obligation, there is no debt to become worthless. The inability to establish the legal liability goes not to the worthlessness *49 of a debt but determines the nonexistence of a debt. . The lack of proof being a sufficient reason for not pursuing the claim, we do not consider material the further assertion that the claim was not pursued because of fear of being refused rental of property owned by Marr's family. Having determined that the amount of the shortage is allowable in computing cost of goods sold, we believe it unnecessary to determine whether or not it is deductible as an inventory loss. Decision will be entered for the petitioner. Footnotes
1. Regulations 111. SEC. 29.22(c)-1. Need of Inventories. - In order to reflect the net income correctly, inventories at the beginning and end of each taxable year are necessary in every case in which the production, purchase, or sale of merchandise is an income producing factor * * *↩